IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CURTIS PENDEGRAFT,                    )
                                      )
            Plaintiff,                )
                                      )
vs.                                   )     Case No. 3:15-cv-816-NJR-DGW
                                      )
DR. ALBERTO BUTALID,                  )
LUKE BRANDMEYER, KYLE THOLE,          )
and DR. FRANCIS KAYIRA,               )
                                      )
            Defendants.               )

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Now pending before the Court are the Motions for Summary Judgment filed by

Defendants (Doc. 141, 148, and 154). For the reasons set forth below, the Motion for

Summary Judgment filed by Defendant Kayira is denied in part and mooted in part

(Doc. 141),[1] the Motion for Summary Judgment filed by Defendant Butalid is granted

(Doc. 148), and the Motion for Summary Judgment filed by Defendants Brandmeyer and

Thole is denied in part, granted in part, and mooted in part (Doc. 154).[2]

### INTRODUCTION

Plaintiff Curtis Pendegraft, an inmate who is currently incarcerated at the

Vandalia Correctional Center, is proceeding on a Complaint filed on July 28, 2015

---

[1] This motion was jointly filed by Defendants Brandi Beasley and Francis Kayira (*see* Doc. 141), however, Beasley has since been dismissed as a defendant (Doc. 209). Therefore, the portion of the motion that pertains to her is moot.

[2] This motion was jointly filed by Defendants Luke Brandmeyer, Kyle Thole, Mike Arnold, Mark Etter, Jacey Faulkner, and Michelle Nordike (*see* Doc. 154). Brandmeyer and Thole are the only two individuals who are still defendants in this action; Arnold, Etter, Faulkner, and Nordike have been dismissed (*see* Doc. 209). Thus, the portions of the motion that pertain to those defendants are moot.

(Doc. 1), and screened pursuant to 28 U.S.C. § 1915A on August 17, 2015 (Doc. 11). He alleges that while he was incarcerated at the Clinton County Jail, from April 8 to August 3, 2014, a hip bone infection was not treated appropriately by various personnel. He further alleges that he was placed in segregation at the Jail after he complained about the lack of treatment. According to Pendegraft, the lack of appropriate treatment continued after he was taken into Illinois Department of Corrections (IDOC) custody in January 2015 and housed at the Graham Correctional Center.[3] As it currently stands, Pendegraft is proceeding on the following counts against the following individuals:

> **COUNT 1:** Kyle Thole, Dr. Alberto Butalid, Luke Brandmeyer, and Dr. Francis Kayira were deliberately indifferent to Plaintiff's needs, in violation of the Eighth Amendment.
>
> **COUNT 2:** Kyle Thole retaliated against Plaintiff for complaining about his need for care by placing him in segregation, in violation of the First Amendment.

Defendants filed their respective motions for summary judgment in March 2017 (Docs. 141, 148, 154). Due to difficulties with his recruited counsel, Pendegraft was not able to file substantive responses to the motions until December 2017 (Docs. 203, 204, and 205)[4] Dr. Kayira filed a reply brief on January 4, 2018 (Doc. 208). Defendants Thole, Butalid, and Brandmeyer did not file reply briefs.

---

[3] Pendegraft was initially detained at the Clinton County Jail following his arrest on April 8, 2014. He was released on bond after he pleaded guilty and after he was sentenced on August 3, 2014. He reported back to the Jail on January 27, 2015, where he was transferred to IDOC custody to serve out his sentence.

[4] *See* Docs. 153, 157, 158, 159, 161, 168, 168, 169, 170, 176, 178, 179, 181.

Pendegraft testified at his deposition that several years prior to his detainment at the Clinton County Jail, which began on April 8, 2014, he suffered from Osteomyelitis, an infection of his hip that required him to be hospitalized and receive intravenous antibiotics (Doc. 203-1, pp. 29–34). Pendegraft further testified that sometime during the month of April 2014, the old wound on his hip opened up and started to drain (*Id.* at p. 43). Pendegraft filled out sick call slips on May 8 and 12, 2014 (*Id.* at p. 128; Doc. 204-2, pp. 148, 149). On the May 8th slip, Pendegraft wrote, "I have a infection and need to see doctor. This is the infection that I have had in the past and has caused me to have 3 prior surgeries. Can I please see the doctor." (Doc. 204-2, p. 148). On the May 12th slip, Pendegraft wrote, "I have a bad infection and I have been hospitalized because of this. My chest is hurting bad, my left arm and hand [are] numb. I lay down and can hardly breath. This is the 2nd slip I filled out." (Doc. 204-2, p. 149).

He was seen by Nurse Michelle Nordike on May 14, 2014 (Doc. 203-1, p. 129; Doc. 204-2, p. 170). Nordike wrote that Pendegraft complained of "chest pain [and] [left] arm numbness [and] tingling in fingers" (Doc. 204-2, p. 170). One week later, Pendegraft was taken to see Dr. Alberto Butalid at his office at Clinton County Rural Health in Carlyle, Illinois (Doc. 203-1, pp. 55, 56; Doc. 149-2; Doc. 152-1). Clinton County Rural Health is a private practice that is owned by and affiliated with HSHS St. Joseph's Hospital in Breese, Illinois (Doc. 149-2). Dr. Butalid does not have a written contract with the county or state to render medical services to inmates (*Id*.). Defendant Luke Brandmeyer was the officer who took Pendegraft to his appointment with Dr. Butalid

(Doc. 203-1, p. 56). Since becoming a sergeant, Brandmeyer "took care of medical" at the Jail but has no medical training (Doc. 204-4, p. 25). He went to as many appointments with Pendegraft as he could because he was the one "dealing with him mostly" (*Id.* at p. 39).

It is undisputed that Pendegraft complained to Dr. Butalid about an infection and also told the doctor about his history of infections (Doc. 203-1, p. 56; Doc. 152-1). Pendegraft claims he also told Dr. Butalid that he had a wound on his right hip that was open and draining, but Dr. Butalid did not look at his hip (Doc. 203-1, pp. 56–57). Dr. Butalid said, however, that Pendegraft did not tell him about an open wound, and the medical records do not reflect such a complaint (Doc. 204-2, pp. 43–44; *see* Doc. 152-1, p. 1). The records indicate that Pendegraft complained of aches and pains in his right shoulder, right hip, neck, and back, and of numbness and a tingly sensation in his left arm for the past two weeks (Doc. 152-1, p. 3). The records also indicate that Pendegraft has scars on his right hip, right shoulder, and back, and that the general appearance of his skin was normal (*Id.*). Dr. Butalid diagnosed Pendegraft with arthritis, gave him Ibuprofen, and also directed a follow-up appointment in two weeks (Doc. 203-1, pp. 56–61; Doc. 152-1). Dr. Butalid also ordered lab work, specifically a complete blood count (CBC), complete metabolic panel (CMP), and erythrocyte sedimentation rate (ESR) (Doc. 152-1).[5] Dr. Butalid indicated he ordered this lab work in order to determine if Pendegraft had an active infection (Doc. 204-2, p. 39).

_____

[5] ESR is a type of blood test that that is used to detect and monitor inflammation. MEDLINE PLUS, *Erythrocyte Sedimentation Rate*, https://medlineplus.gov/labtests/erythrocytesedimentationrateesr.html. While the test indicates the presence of inflammation in the body, it does not specify where the

At the follow-up appointment on June 4, 2014, Dr. Butalid's notes indicate a one centimeter lesion with drainage on Pendegraft's lower right abdomen (Doc. 152-2, p. 2).[6] The notes also indicate that Pendegraft's bloodwork was unremarkable except for elevated "ESR of 48" (*Id.*). Pendegraft testified that Dr. Butalid told him that his white blood cell count was high and he had an infection (Doc. 203-1, p. 65). Dr. Butalid ordered a wound culture and sensitivity testing of the wound in order to identify the bacteria causing the infection and the medication that would best treat it (Doc. 152-2; Doc. 204-2, pp. 71).[7] Dr. Butalid also prescribed a ten-day course of antibiotics, directed a follow-up in one week, and ordered Pendegraft to keep the wound covered (Doc. 152-2; Doc. 204-2, p. 156). These instructions were conveyed to the Jail using their form (Doc. 204-2, p. 156).

By the follow-up appointment on June 11, 2014, the results of the wound culture were back and showed that Pendegraft had Staph aureus (Doc. 204-2, p. 64; *see also* Doc. 152, p. 6). Dr. Butalid noted that the wound was "still draining" and referred Pendegraft to Dr. Timothy Ruff, a general surgeon, for an evaluation to see if the wound could be closed (Doc. 152-3; *see* Doc. 204-2, pp. 98, 175–189). It is undisputed that Pendegraft saw Dr. Ruff on July 1, 2014 (*see* Doc. 204-2, pp. 175–189). Dr. Ruff noted that the wound was open about 3 x 3 millimeters with "very slight purulent exudate" (*Id.*). Dr. Ruff ran additional lab work and another wound culture (*see id.*). He also ordered a

inflammation is or what is causing it. *See id.* The normal range for men is between 15 and 20 mm/hr. Christopher P. Kellner, M.D., MEDSCAPE, *Erythrocyte Sedimentation Rate*, https://emedicine.medscape.com/article/2085201-overview#a4.

[6] The note says "wound on RLQA," which the Court assumes to mean right lower quadrant of the abdomen (*see* Doc. 152-3, p. 2).

[7] LAB TESTS ONLINE, *Bacterial Wound Culture*, https://labtestsonline.org/tests/bacterial-wound-culture.

CT scan of Pendegraft's abdomen and pelvis, which was performed on July 2nd (*see id.*). The CT scan revealed an "irregularity" on Pendegraft's right hip bone possibly caused by chronic Osteomyelitis (*Id.*; Doc. 152-5, p. 1). Pendegraft had a follow-up appointment with Dr. Ruff on July 14, 2014 (*see* Doc. 204-2, pp. 175–189). Dr. Ruff indicated that the wound culture indicated Pendegraft had MSSA, or methicillin susceptible Staphylococcus aureus (*Id.*). Dr. Ruff's diagnosis was "probable chronic osteo[myelitis]," and he noted that Pendegraft needed to be referred to an infectious disease specialist for further evaluation and treatment but that Dr. Butalid would take care of the referral (*Id.*). Although it isn't entirely clear, it appears that Dr. Butalid referred Pendegraft to Dr. Nida Subhani sometime within the week following the second visit with Dr. Ruff (*see* Doc. 152-6, Doc. 152-7).[8]

Pendegraft saw Dr. Butalid again on July 22, 2014, at which time Pendegraft complained about a "new spot" on his right hip and stated "he would like to be admitted to the hospital because he is doing worse" (Doc. 152-5, p. 1). Dr. Butalid noted a second open wound on Pendegraft's hip and noted that the lesions were now three centimeters, red, swollen under the skin, and "sore with a point in the middle draining scanty yellow discharge" (*Id.* at p. 2; Doc. 204-2, p. 66). Dr. Butalid diagnosed Pendegraft with an abscess and cellulitis on his right hip and an enlarged lymph node in his right groin (Doc. 152-5, p. 3; Doc. 204-2, p. 72). He ordered a ten-day course of a different antibiotic—doxycycline hyclate, continued the prescription for Ibuprofen for

---

[8] There is a fax cover sheet from Dr. Butalid to Dr. Subhani that is dated July 21, 2014, and it states "Here are more test results to go with new [patient]. If Dr. Subhani thinks he needs seen sooner can we move up appointment" (Doc. 152-6). This suggests that sometime before this fax was sent on July 21st, Dr. Butalid had contacted Dr. Subhani about seeing Pendegraft.

Pendegraft's pain, and directed Pendegraft to follow-up with him in ten days (Doc. 152-5, p. 3). In the paperwork he provided to the Jail, Dr. Butalid included instructions to change the dressing on Pendegraft's wound daily and to "send to ER for possible admission per [Pendegraft's] request" (Doc. 204-2, p. 163). At his deposition, Dr. Butalid confirmed that it was his intent that Pendegraft be taken to the emergency room and that he told the guards to take him to the emergency room (Doc. 204-2, p. 69-70). It is undisputed that Pendegraft was not taken to the emergency room.

Brandmeyer did not go with Pendegraft to the July 22nd appointment with Dr. Butalid (Doc. 204-4, p. 53). Instead, Transport Officer Lupker took Pendegraft to that appointment (*Id.* at p. 63). Although Brandmeyer reviewed Dr. Butalid's recommended course of treatment, he did not recall seeing the instruction about the emergency room and did not know why Pendegraft was not taken to the emergency room (*Id.* at pp. 53, 64–66).

Pendegraft saw Dr. Subhani two days later on July 24, 2014 (Doc. 152-7). She noted that Pendegraft had two lesions, one on the right lower abdomen and another on the right lateral hip (*Id.* at p. 3). She diagnosed Pendegraft with chronic Osteomyelitis and MSSA infection and stated:

> Unless a surgical intervention is done he will need antibiotics for a very long time. Given that the infection is flared and appears to be worsening I will prefer we treat patient with at least 3-4 weeks of IV antibiotics such as rocephine given MSSA infection and then resume doxycycline. Patient does have appointment with an orthopedic surgeon.[9] I will see what he will recommend. Meanwhile I have asked the sargent [sic] accompanying

[9] Dr. Butalid also referred Plaintiff to Dr. Donald Bassman, who is an orthopedic surgeon (Doc. 205-2, p. 101). The referral form was filled out by Dr. Butalid's staff, and it is dated July 25, 2014 (Doc. 204-2, p. 190).

the patient to find out how we can arrange the IV antibiotics. I will follow.
However unless a treatment is started no appointment is being made.

(*Id*. at pp. 3–4).

Dr. Butalid received Dr. Subhani's report on July 29, 2014 (Doc. 204-2, p. 80).
When asked if he passed along Dr. Subhani's recommended course of treatment to the
Jail, he testified, "I think at one point my staff called and checked, you know, there was
something done that, you know, but I didn't have any record of that" (*Id.* at p. 82). He
went on to testify more affirmatively that one of his staff (but he could not remember
who) called the Jail to make sure that he was getting the intravenous antibiotics
recommended by Dr. Subhani (*Id.* at pp. 82–83). Defendant Brandmeyer was the contact
person at the Jail for such requests (*Id.* at pp. 83-84).

Brandmeyer testified that he went with Pendegraft to his appointment with Dr.
Subhani (Doc. 204-4, pp. 68–69). He recalls discussing with Dr. Subhani the logistics of
administering the antibiotics, *e.g.,* that Pendegraft needed to get a PICC line and whether
the antibiotics needed to be administered at the hospital or could be administered at the
Jail (*Id.* at p. 69; *see also* Doc. 204-3, pp. 40–41). He also recalls calling Dr. Subhani and
discussing whether Pendegraft needed the intravenous antibiotics immediately and if
there were any other treatment options (Doc. 204-4, p. 70; *see also* Doc. 204-3, pp. 40–41).
Brandmeyer recalls discussing the matter with the Sheriff (Doc. 204-4, p. 70). According
to Brandmeyer, "there wasn't a final decision not to follow through with that treatment.
[Pendegraft] ended up being released from custody, and he was able to get that
treatment on his own" (*Id.* at p. 71). Pendegraft testified, however, that he spoke to

Officer Kyle Thole about the intravenous antibiotic treatment recommended by Dr. Subhani, and Thole told him he would not be getting the treatment (Doc. 204-1, pp. 102, 167). Pendegraft then asked Thole for a grievance form, and Thole "got mad" and sent Pendegraft to segregation (*Id.*). For his part, Officer Thole testified that Pendegraft was placed in segregation for being disrespectful towards him (Doc. 204-5, pp. 12-14). Thole recounts that Pendegraft was "loud, disruptive, screaming, you know, just rude" and that he was "wanting to go to the ER room" (*Id.* at p. 13).

Pendegraft claims he was put in segregation sometime after his appointment with Dr. Subhani on July 24, 2014—"like three days after I seen Dr. Subhani" (Doc. 203-1, p. 168). And he stayed in segregation until he pleaded guilty and was released on bond on August 3, 2014 (Doc. 203-1, p. 169). Thus, according to Pendegraft, he was in segregation for approximately one week to a week and a half. Thole claims, however, that Pendegraft would have only been in "lock down" for 72 hours (Doc. 20-, p. 15).

A couple days later, on August 3, 2014, Pendegraft accepted a plea deal because Clinton County agreed to release him on bond so that he could go to the hospital and get the intravenous antibiotic treatment (Doc. 203-1, p. 100–103). Pendegraft went back to see Dr. Subhani on August 12th; he was admitted to the hospital, had a PICC line installed, and began a six-week course of intravenous antibiotics (Doc. 203-3, pp. 46–51, 107–113). When Pendegraft finished the course of intravenous antibiotics, Dr. Subhani directed him to take doxycycline indefinitely, "until . . . we know the source of the infection is removed" (Doc. 203-3, p. 60). She provided him with an ongoing prescription

for the doxycycline and instructed him to begin taking it "the day you stop the IV antibiotic" (*Id.* at p. 60, 104).

Sometime during the course of intravenous antibiotics, Pendegraft started seeing Dr. Mark McCleary for primary care (*see* Doc. 203-3, p. 56). Dr. McCleary ordered an MRI of Pendegraft's right hip and lumbar spine, which were performed on October 20, 2014 (Doc. 142-2). Approximately one week later, Dr. Jeffrey Whiting, an orthopedic surgeon at St. Louis University Hospital, noted that it appeared the osteomyelitis in Pendegraft's right hip "cleared up . . . as his new magnetic resonance imaging does not show any osteomyelitis or joint effusion in the right hip" (Doc. 142-1). Dr. Whiting determined that Pendegraft was not a candidate for total hip replacement, and he recommended that Pendegraft see a general surgeon or a spinal surgeon for further evaluation "given his history of a draining wound from an intra-abdominal drain and questionable history of infected hardware from his lumbar spine" (*Id.*). Pendegraft saw another surgeon in January 2015, who indicated there was no evidence of infection in Pendegraft's lumbar spine fusion area, and he did not recommend any further surgery (Doc. 203-1, pp. 117–118).

Pendegraft saw his primary physician Dr. McCleary one last time on January 20, 2015 (Doc. 142-3). At that appointment, Pendegraft complained of pain in his right shoulder when he moved it (*Id.*) Dr. McCleary noted that Pendegraft was "taking percocet regularly, but it is not helping" (*Id.*). After examining Pendegraft, Dr. McCleary indicated that Pendegraft was showing signs of bursitis in his shoulder, which the doctor decided to treat with a 10-day course of the steroid prednisone (*Id.*). Dr.

McCleary's notes state: "Will treat with prednisone taper. No additional pain medication at this time. Follow up as needed. Continue current medication. Continue current therapy." (*Id.*). Pendegraft's current medications listed were Ambien (insomnia medication), Lisinopril-hydrochlorothiazide (blood pressure medication), and Percocet (pain medication) (*Id.*).[10]

Pendegraft reported to the Clinton County Jail on January 27, 2015, and he was transferred to Graham Correctional Center to serve out his sentence. A nurse at Graham wrote that Pendegraft arrived "[with] meds verified through Clinton Co[unty] Jail" (Doc. 142-8, p. 1). The nurse further indicated that Dr. Francis Kayira, the physician at Graham, was notified and that the doctor's orders had been received (*Id.*). Specifically, Dr. Kayira ordered that Pendegraft's blood pressure medications be continued but ordered that his insomnia medication and the doxycycline—the antibiotic that Dr. Subhani recommended he take indefinitely—be discontinued (*Id.*). Dr. Kayira also discontinued the pain medication and instead prescribed a two-week supply of Tylenol (*Id.*). He also ordered another culture of Pendegraft's hip wound and ordered that the wound be kept covered (*Id.*).

Pendegraft was transferred to Vienna Correctional Center on February 13, 2015 (Doc. 203-1, p. 209). The physician at Vienna called Dr. Subhani's office on the 25th and asked if Pendegraft was supposed to continue the doxycycline (Doc. 203-3, pp. 60–62,

---

[10] Ambien is a sedative used to treat insomnia; the generic version is called zolpidem. Lisinopril-hydrochlorothiazide is a combination drug used to treat high blood pressure. Percocet is a combination of oxycodone and acetaminophen; oxycodone is an opioid used to relieve moderate to severe pain. MEDLINE PLUS, *Zolpidem,* https://medlineplus.gov/druginfo/meds/a693025.html; *Lisinopril-hydrochlorothiazide,* https://medlineplus.gov/druginfo/meds/a601070.html; *Oxycodone,* https://medlineplus.gov/druginfo/meds/a682132.html.

100). A nurse from Dr. Subhani's office made a note indicating she spoke to the prison physician, and he was going to continue the doxycycline for "chronic suppression" of the infection (*Id.*). It appears from a medication administration record that within two weeks of Pendegraft's arrival at Vienna, he started receiving his antibiotics again and Tylenol #3 for his pain (Doc. 142-6). Pendegraft testified that, in July 2015, he developed another infection, this time in his right shoulder (Doc. 203-1, pp. 121–122). He acknowledged, however, that no doctor has told him that the shoulder infection was in any way related to his prior hip infection (*Id.*).

LEGAL STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *United States v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (alteration in original). "Once the moving party puts forth evidence showing the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013)

(citation and internal quotation marks omitted). In deciding a motion for summary judgment, "[a] court may not . . . choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted).

### DISCUSSION

**A.   DELIBERATE INDIFFERENCE**

To recap, in Count 1, Pendegraft alleges that Dr. Alberto Butalid, Luke Brandmeyer, Kyle Thole, and Dr. Francis Kayira were deliberately indifferent to his serious medical needs when they failed to provide him with appropriate treatment for the infection in his hip.

In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, a plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Second, a plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *Greeno*, 414 F.3d at 653.

There is no dispute that the infection in Pendegraft's hip bone was an objectively serious medical condition (*see* Docs. 141, 148, 154), so the Court will assume it was for the purpose of this Order. Therefore, the only question for the Court is whether Defendants

acted with deliberate indifference. In order to survive summary judgment on this issue, Pendegraft must put forth evidence that the prison officials knew that his medical condition posed a serious health risk, but they consciously disregarded that risk. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution."). Pendegraft does not have to prove that his complaints were "literally ignored," but only that Defendants' responses "were so plainly inappropriate as to permit the inference that [they] intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

### 1. Dr. Alberto Butalid

Pendegraft claims that Dr. Alberto Butalid was deliberately indifferent to his serious medical needs essentially because he took too long to diagnose Pendegraft's infection and to refer him to specialists, and then did nothing to push the specialists' care along or to follow-up on their recommended treatments (Doc. 1, Doc. 11, Doc. 205). Before addressing the merits of the deliberate indifference claim, however, the Court must first address Dr. Butalid's argument that he is entitled to summary judgment because he was not acting under the color of state law (Doc. 149).

a. *Acting Under Color of State Law*

In order to prevail on a claim pursuant to Section 1983, a plaintiff must show that: "a person acting under color of state law deprived him of a right, privilege, or immunity secured by either the Constitution or by federal law." *Rossi v. City of Chicago*, 790 F.3d 729, 734 (7th Cir. 2015). In *West v. Atkins*, the Supreme Court held that a private physician acts under color of state law for Section 1983 purposes when the physician contracts with the state to provide medical services to inmates at a state prison hospital. *See West v. Atkins*, 487 U.S. 42 (1988). The Supreme Court has not, however, addressed whether a private physician acts under color of state law when the physician provides medical care to a prisoner in a private facility outside of the prison. In the absence of a directive from the Supreme Court, the Seventh Circuit developed a test based on *West* for such situations *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 826–28 (7th Cir. 2009). The focus of the test is "the particular *function* of the medical care provider in the fulfillment of the state's obligation to provide health care to incarcerated persons." *Rodriguez*, 577 F.3d at 825 (citing *West*, 487 U.S. 42).

> It is the physician's *function* within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State. Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the *relationship among the State, the physician, and the prisoner*. Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights. The State bore an affirmative obligation to provide adequate medical care to West. The State delegated that function to respondent Atkins; and respondent voluntarily assumed that obligation by contract.

West, 487 U.S. at 55–56.

This functional analysis takes into account several factors. The first factor is the setting in which the medical care is rendered. *Rodriguez*, 577 F.3d at 826. This does not mean that "all medical advice rendered outside of the prison walls is exempt from the state action doctrine simply because it is provided outside the prison." *Id.* Rather, it is a reminder "to assess the *degree* to which the professional decisions made in rendering the care are influenced by the status of the patient as a prisoner and the directives of the state, as the ultimate responsible party for the prisoner's health care, with respect to the manner and the mode of care." *Id.* at 827 (emphasis in original).

The second factor is whether a contractual relationship exists between the medical provider and the state. *Rodriguez*, 577 F.3d at 827. A contractual relationship indicates that the medical provider "is undertaking freely, and for consideration, responsibility for a specific portion of the state's overall obligation to provide medical care for incarcerated persons." *Id.* "In such a circumstance, the provider has assumed freely the same liability as the state." *Id.* On the other hand, if the relationship is "incidental and transitory," then it "usually cannot be said" that the medical provider has voluntarily assumed the state's responsibility of providing medical care to prisoners. *Id.*

The third factor is whether the medical provider has "a direct, not an attenuated, relationship" with the prisoner. *Rodriguez*, 577 F.3d at 828. "To the degree that a private entity does not replace, but merely assists the state in the provision of health care to prisoners, the private entity's responsibility for the level of patient care becomes more attenuated, and it becomes more difficult to characterize its actions as the assumption of a function traditionally within the exclusive province of the state." *Id.*

Here, Dr. Butalid does not have a contract with the state to provide medical care to detainees at the Clinton County Jail, and he is not directly paid by the state. That being said, his relationship with the state cannot be characterized as incidental or transitory. He has been treating detainees from the Clinton County Jail for approximately ten years, and he is the sole provider of primary medical care for inmates at that facility (Doc. 204-2, pp. 19–21). Dr. Butalid sees detainees from the Jail at his office, which is part of a private practice in Carlyle, Illinois. But the detainees are not treated like regular patients of Dr. Butalid. They appear with guards, who remain with the detainee at all times, even in the exam room during the examination (*Id.* at pp. 22–25). The detainees enter Dr. Butalid's office through a separate back door (*Id.*) Dr. Butalid fills out paperwork generated by the Jail (*Id.*) The detainees do not have a say in when their appointment with Dr. Butalid is scheduled, whether to accept Dr. Butalid's treatment recommendations, or the manner in which the treatments will be administered. Jail officials make these determinations (*see* Doc. 204-4, pp. 24, 64–66, 69, 70, 74).

Based on this evidence, the Court concludes that a genuine issue of material fact exists as to whether Dr. Butalid's actions can be attributed to the state and he can be considered a state actor. Consequently, Dr. Butalid is not entitled to summary judgment on his claim that he was not acting under the color of state law when he provided medical care to Pendegraft.

### b. *Deliberate Indifference*

"There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Holloway v. Delaware*

*Cnty. Sheriff,* 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir. 2008)). Federal courts will not interfere with a doctor's treatment decision unless that decision was "blatantly inappropriate" or "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014) (citing *Greeno v. Daley,* 414 F.3d 645, 654 (7th Cir. 2005)); *Holloway,* 700 F.3d at 1073 (quoting *Sain v. Wood,* 512 F.3d 886, 895 (7th Cir. 2008)). A physician's treatment decision is based on professional judgment if it is fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm, and the efficacy of available treatments. *Roe v. Elyea,* 631 F.3d 843, 860 (7th Cir. 2011) (citing *Collingon v. Milwaukee Cnty.,* 163 F.3d 982, 989 (7th Cir. 1998)).

Pendegraft points to three instances in which he claims Dr. Butalid exhibited deliberate indifference to his serious medical needs (*see* Doc. 205). First, at the appointment on May 21st, Pendegraft claims Dr. Butalid ignored his medical history and did not examine Pendegraft's open wound despite Pendegraft's complaints about the wound (*Id.*). Second, at the July 22nd appointment, Dr. Butalid did not hospitalize Pendegraft even though his condition was worsening, he had developed a second wound, and he requested to be hospitalized (*Id.*). Third, Dr. Butalid did not ensure that Dr. Subhani's recommendation for intravenous antibiotics was implemented (*Id.*).

The Court turns first to Pendegraft's argument about the May 21st appointment. Pendegraft testified at his deposition that he complained to Dr. Butalid that he had an

open, draining wound on his right hip but that Dr. Butalid did not bother to look at the wound (Doc. 203-1, pp. 56–57). Pendegraft's recollection, however, "is flatly refuted by other evidence in the record." *Melton v. Tippecanoe Cnty.*, 838 F.3d 814, 819 (7th Cir. 2016) (citation omitted).

Most importantly, it is refuted by the two sick call slips that led to the appointment with Dr. Butalid. These slips were handwritten by Pendegraft himself. On the first slip, Pendegraft wrote only that he had "an infection" (Doc. 204-2, p. 149). On the second slip, Pendegraft again wrote that he had an infection, and also complained of pain in his chest and numbness in his left arm and hand (Doc. 204-2, p. 149). Neither slip mentioned an open, draining wound (*see* Doc. 204-2, pp. 148, 149). Two days after he wrote the second slip, Pendegraft saw Nurse Michelle Nordike, and she wrote that Pendegraft complained of "chest pain [and] [left] arm numbness [and] tingling in fingers" (Doc. 204-2, p. 170). There is no indication that Pendegraft complained to Nordike of an open, draining wound (*see Id.*). One week later, Pendegraft saw Dr. Butalid, and the doctor wrote that Pendegraft complained about pain in his shoulder, hip, neck and back, and numbness and tingling in his left arm (Doc. 152-1). Once again, there is no mention of an open wound (*see id.*). It stands to reason that if Pendegraft had an open, draining wound at that point, he surely would have mentioned it in his sick call slips and to the two medical providers that he saw. It also stands to reason that if Pendegraft had an open wound on or near his abdomen, or a sock or washcloth stuffed into his clothing to cover that wound, that Dr. Butalid would have noticed something when he conducted his abdominal exam of Pendegraft. But the section of the medical

record memorializing the abdominal exam shows nothing out of the ordinary (*see id.*; *see also* Doc. 206-2, p. 44*)*.

Simply put, Pendegraft's testimony that he had an open wound and told Dr. Butalid about it at the appointment on May 21st is contradicted by every pertinent document in this case. The Court normally avoids making credibility determinations on summary judgment, but in this instance, the Court simply cannot accept Pendegraft's version of the facts because "no reasonable person would believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Melton*, 838 F.3d at 819 ("But relying on recollection does not mean the plaintiff may survive summary judgment where his recollection is flatly refuted by other evidence in the record.") (citation and internal quotation marks omitted).

The Court certainly understands why Pendegraft is frustrated with the care he received at his first appointment from Dr. Butalid. In his mind, Pendegraft knew exactly what was going on and what he needed because he had experienced it before. He also knew that the longer he went without antibiotics, the worse the infection would get and he could potentially end up hospitalized again. He feels like the doctor did not listen to him, but the Court does not think it's quite that simple. This appointment was the first time Dr. Butalid had ever met or laid eyes on Pendegraft. Pendegraft basically reported generalized pain throughout his body (shoulder, hip, neck, back, chest, head), some

numbness in his arm, and dizziness. He also complained about an infection, but he had no fever or other outward sign of an infection. Nevertheless, Dr. Butalid took Pendegraft's medical history and concern about an infection into account and ordered blood tests to determine if Pendegraft did, in fact, have an infection. It seems like a completely reasonable course of action to use objective testing to confirm an infection in order to avoid prescribing unnecessary antibiotics. There is certainly no evidence that it was "blatantly inappropriate" or a substantial departure from accepted professional norms.

The Court turns next to Pendegraft's argument that Dr. Butalid failed to hospitalize Pendegraft after the July 22nd appointment. Once again, there is no showing that Dr. Butalid "knowingly disregard[ed] a risk to an inmate's health." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (citing *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)). Dr. Butalid directed that Pendegraft be taken to the emergency room. It is undisputed that jail personnel did not follow his instructions. There is no evidence that Dr. Butalid either knew or had reason to believe that his instructions would not be carried out. There also is no evidence that Dr. Butalid had the authority to send Pendegraft to the hospital without approval from Jail officials. The Court assumes that Dr. Butalid could have called 911 if this were a true emergency, but there is just no evidence that was the case. In fact, when Dr. Subhani saw Pendegraft two days later, she apparently did not think Pendegraft required emergency treatment or hospitalization because she did not recommend either (Doc. 152-7).

Lastly, the Court addresses Pendegraft's argument that Dr. Butalid failed to ensure that Dr. Subhani's treatment plan was followed. Pendegraft claims that Dr. Butalid "failed to adopt Dr. Subhani's conclusions; failed to implement [her] recommended course of treatment; failed to even personally discuss [her] recommendations with Clinton County Jail officials; and thus, failed to convey the severity and immediate necessity of starting antibiotic treatment as quickly as possible to Clinton County officials, who to this point had relied upon his expertise in determining how to treat Plaintiff's complaints" (Doc. 205, p. 7). But the Court fails to see why any of this was necessary. Dr. Butalid presumably referred Pendegraft to Dr. Subhani because Pendegraft's condition was beyond his knowledge, technical skill, ability, or capacity to treat. Dr. Subhani informed Officer Brandmeyer about the nature of Pendegraft's infection and the need for intravenous antibiotics, and she told Brandmeyer that he needed to figure out the logistics of how Pendegraft was going to get that treatment (Doc. 203-3, pp. 40–44). There is no indication that the Jail needed Dr. Butalid's authorization or assistance to set up or administer the treatment recommended by Dr. Subhani. There is also no indication that Dr. Subhani requested, needed, or wanted Dr. Butalid to advocate for or oversee the treatment she recommended. Consequently, no reasonable jury could conclude that Dr. Butalid's non-involvement constituted deliberate indifference.

Again, the Court sympathizes with Pendegraft's frustrations that things did not move as quickly as he wanted. He thought he needed intravenous antibiotics all along, but it took him approximately two and a half months to get to the infectious disease

doctor to prescribe that treatment. There is simply no evidence, however, that Dr.
Butalid's decisions along the way were blatantly inappropriate or that he intended to
delay or deny medical care. At the beginning, Dr. Butalid saw Pendegraft three times in
three weeks. Within those three weeks, Dr. Butalid ran blood tests to determine
Pendegraft's condition, ordered antibiotics when it was determined that he had an
infection, cultured the wound to determine the exact nature of the infection, and referred
Pendegraft to a surgeon. Pendegraft then saw the surgeon twice in two weeks and
underwent more diagnostic testing. At the surgeon's suggestion, Dr. Butalid referred
Pendegraft to an infectious disease specialist. Dr. Butalid followed-up with Pendegraft
once more in between his appointments with the specialists. All in all, Pendegraft had
seven appointments—four with Dr. Butalid and three with the specialists—within a
nine-week timeframe. If the totality of care that Pendegraft received in those two and
half months is considered, no reasonable jury would find that Dr. Butalid was
deliberately indifferent to his medical needs. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir.
2016) (en banc). Consequently, Dr. Butalid is entitled to summary judgment on
Pendegraft's deliberate indifference claim.

### 2. Dr. Kayira

Pendegraft contends that Dr. Kayira was deliberately indifferent when he
discontinued Pendegraft's prescriptions for doxycycline and Percocet when Pendegraft
arrived at Graham (Doc. 1; Doc. 11). Pendegraft claims that as a result of the
discontinuation of his medications, he was left in pain and developed another infection
in July 2015 (*Id.*).

With regard to the antibiotic, Dr. Kayira argues that is was reasonable for him to discontinue this medication because the MRIs performed in October 2014 indicated that Pendegraft's infection had resolved, and there was no evidence the infection had returned (Doc. 142, pp. 7–9). Dr. Kayira contends that because Pendegraft did not have an active infection, the antibiotic medication was not medically necessary (*Id.* at p. 9). But there is evidence from which a jury could conclude otherwise. Namely, Dr. Subhani indicated that Pendegraft needed to take the antibiotic indefinitely to suppress the infection until the source of the infection had been identified and removed.

As for the Percocet, Dr. Kayira argues that it was acceptable for him to discontinue this medication because Pendegraft did not have an active prescription for it at the time he returned to custody (Doc. 142, p. 8). This argument is based entirely on Dr. McCleary's notes from January 20, 2015, which state, in part, "Shoulder pain—[patient] with signs of bursitis. Will treat with prednisone taper. *No additional pain medication at this time*. Follow up as needed" (citing Doc. 142-3) (emphasis added). Dr. Kayira interprets "No additional pain medication at this time" to mean that Dr. McCleary took Pendegraft off the Percocet and did not prescribe any other pain medication (Doc. 142, pp. 7–8). But this interpretation disregards that Dr. McCleary's notes also state "Continue current medication" and that Percocet is listed as one of Pendegraft's current medications (Doc. 142-3). It also disregards Pendegraft's testimony that he was still taking Percocet when he reported to the Clinton County Jail on January 27, 2015 (Doc. 203-1, pp. 118, 201–202). This additional evidence suggests that "No additional pain medication at this time" might not mean what Dr. Kayira says it does. Instead, it could mean that Dr.

McCleary continued Pendegraft's prescription for Percocet but wasn't going to prescribe any pain medication stronger than the Percocet or in addition to the Percocet.

The Court also notes that Dr. Kayira's arguments imply that he reviewed Pendegraft's medical records before deciding to discontinue the antibiotics and pain medication, however, there is absolutely no evidence that suggests that is true. The only evidence Dr. Kayira submitted was three pages of "Offender Outpatient Progress Notes" from Graham Correctional Center (Doc.142-8). While the note containing his orders indicates that Pendegraft's medications were "verified through Clinton County Jail," it does not specify what information the Jail provided (*see id.* at p. 1). The note does not indicate the reasons the medications were discontinued and it does not suggest that Dr. Kayira spoke to Pendegraft or examined him (*see id.*). In other words, there is nothing in the note from which the Court can glean the rationale for Dr. Kayira's decision to discontinue Pendegraft's antibiotics and pain medications (*see* Doc. 142). Furthermore, Dr. Kayira did not submit any deposition testimony or an affidavit in which he explained what materials he reviewed or otherwise relied on in making his decision to discontinue Pendegraft's antibiotics and pain medications (*see* Doc. 142, 142-1 through 142-8). Consequently, the Court has no idea on what Dr. Kayira's decision was based. In other words, the evidence, when viewed in a light most favorable to Pendegraft, suggests that Dr. Kayira's decision to discontinue Pendegraft's antibiotics and pain medication was based on little, if any, information about Pendegraft or his medical history. Consequently, a reasonable jury could conclude that his decision was blatantly

inappropriate and not based on professional judgment. For that reason, Dr. Kayira is not entitled to summary judgment.

### 3. Luke Brandmeyer and Kyle Thole

Non-medical defendants, like Brandmeyer and Thole, are entitled to rely on the medical judgment of medical personnel. *Greeno v. Daley*, 414 F.3d 645, 655-656 (7th Cir. 2005) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004)). However, while they may rely on the competence of prison doctors, they still "cannot simply ignore an inmate's plight." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *see also Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

Brandmeyer and Thole's argument that they are entitled to summary judgment is presented in a very general fashion (*see* Doc. 154, p. 8). They simply state that "Plaintiff has failed to meet his burden of proof that [they] were deliberately indifferent to his medical needs," because Pendegraft was seen and/or treated by medical professionals on at least eight occasions during his four month incarceration at the Clinton County Jail (*Id.*). They point out that Pendegraft "was seen and treated by Dr. Butalid on several occasions," was referred to and seen by a surgeon on two occasions, and was also seen by an infectious disease specialist (*Id.*) According to Defendants, "[t]his is arguably superior treatment than an individual not incarcerated would be able to undergo in a four month period." (*Id.*). Defendants also point out that Pendegraft testified that "he was never denied seeing a doctor or a nurse" (*Id.*; *see* Doc. 203-1, pp. 171, 174). Consequently, Defendants contend that "Plaintiff can hardly argue that [they] were

aware of his condition and consciously disregarded it." (*Id.*)

However, the fact that Pendegraft received some medical are does not automatically entitle Brandmeyer and Thole to summary judgment. *See, e.g., Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). Pendegraft argues that Brandmeyer and Thole were deliberately indifferent to his serious medical needs when they failed to give him bandages, failed to take him to the hospital per Dr. Butalid's recommendation, and failed to implement the course of intravenous antibiotics recommended by Dr. Subhani (Doc. 204).

With respect to the bandages, Pendegraft had a doctor's order to keep his wound covered by June 4, 2014 (Doc. 203-2, p. 156). But Pendegraft testified at his deposition that he had to use washcloths, socks, or his underwear to cover his wound because "Clinton County didn't have any bandages" (Doc. 203-1, pp. 54–55). He claims he did not start getting bandages until sometime in July (Doc. 203-1, pp. 80–83). He also claims that Brandmeyer was the officer responsible for purchasing the bandages (Doc. 205-1, p. 83), which Brandmeyer did not refute (*see Doc.* 204-4). Pendegraft did not, however, make any argument or point to any evidence that Thole ignored or refused his requests for bandages (*see* Doc. 204, Doc. 203-1).

With respect to the hospital, on July 21, 2014, Dr. Butalid wrote on the paperwork he provided the Jail "send to ER for possible admission per [patient's] request" (Doc. 204-2, p. 163). Brandmeyer testified that he reviewed the paperwork from Dr. Butalid in order to determine when the next appointment would be, but he does not recall seeing the note about taking Pendegraft to the hospital (Doc. 204-4, pp. 53, 64–66).

It is undisputed that Pendegraft was not taken to the emergency room. Whether Brandmeyer overlooked Dr. Butalid's direction, or ignored it as Pendegraft claims, is an issue of fact that must be decided by the jury. As to Officer Thole, there is no evidence that he was aware of Dr. Butalid's direction that Pendegraft be sent to the emergency room. The evidence Pendegraft attempts to rely on simply shows that Thole was the "receiving officer" who signed the medical request form filled out by Pendegraft on July 16, 2014 (Doc. 204, p. 5; Doc. 204-4, p. 155). Thole's signature was dated July 17th (Doc. 204-4, p. 155). Dr. Butalid's instruction regarding the hospital was at the bottom of that form, but it was not issued until July 21st (*Id.*). As such, there is no evidence that Thole was aware of or involved in the emergency room visit.

As for the intravenous antibiotics, there is evidence that both Brandmeyer and Thole were aware that Dr. Subhani had recommended this treatment for Pendegraft (*see* Doc. 203-1). There is no evidence, however, that Thole had any role in determining whether Pendegraft received this treatment or in arranging for the treatment to begin. As for Brandmeyer, it is undisputed that he was in charge of obtaining authorization for the treatment from the Sheriff and figuring out the logistics of how Pendegraft was going to get that treatment. It is also undisputed that Pendegraft never received the treatment while he was detained at the Jail. Viewing the evidence in a light most favorable to Pendegraft and drawing all inferences in his favor, a reasonable jury could find that Brandmeyer opted to drag his feet until Pendegraft was released from the Jail. Delaying necessary medical treatment can support a claim of deliberate indifference. *See Lewis v. McLean*, 864 F.3d 556, 564 (7th Cir. 2017) (finding that a jury could find that

inaction by a correctional officer is sufficient to support a finding of deliberate indifference).

For these reasons, Thole is entitled to summary judgment on Pendegraft's claim of deliberate indifference, but Brandmeyer is not.

**B.**   **RETALIATION**

In Count 2, Pendegraft claims Officer Kyle Thole retaliated against him in violation of the First Amendment. Specifically, Pendegraft claims that he asked Officer Thole about the intravenous antibiotic treatment that Dr. Subhani recommended, and Thole told him that it had been decided Pendegraft was not going to get the treatment (Doc. 203-1, pp, 101–102, 167). Pendegraft contends that he asked Thole for a grievance form to address this decision, and Thole got mad and put him in segregation (*Id.*). For his part, Officer Thole testified that Pendegraft was placed in segregation for being disrespectful towards him (Doc. 204-5, pp. 12-14). Thole recounts that Pendegraft was "loud, disruptive, screaming, you know, just rude" and that he was "wanting to go to the ER room" (*Id.* at p. 13).

Prison officials may not retaliate against an inmate for exercising his First Amendment rights, even if their actions would not independently violate the Constitution. *See Zimmerman v. Tribble,* 226 F.3d 568, 573 (7th Cir. 2000); *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987) ("an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper"); *see also Bridges v. Gilbert*, 557 F.3d 541, 552 (7th Cir. 2009). To prevail on a First Amendment retaliation claim, a plaintiff

must ultimately show that he (1) engaged in activity protected by the First Amendment; (2) suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the defendants' decision to take the retaliatory action. *Bridges,* 557 F.3d at 546 (quoting *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006)).

Here, Thole makes no argument regarding the first element (*see* Doc. 154, pp. 9–10). He challenges only Pendegraft's ability to establish the second and third elements but focuses mainly on the third element (*see id.*), so that is where the Court will begin.

Thole acknowledges Pendegraft's testimony that he asked for a "grievance" and was placed in segregation (Doc. 154, pp. 9–10). But Thole argues this is not sufficient to make a showing "that being placed in segregation was a result of a desire to retaliate against him exercising his First Amendment right" (*Id.*). Thole also cites to his own affidavit, which states that inmates are only placed in segregation for violating the Jail rules, and an inmate at the Jail would not be disciplined for requesting or filing grievances (*Id.*; Doc. 154-2).

Thole's argument is unconvincing. If a jury believes Pendegraft's version of events—that Pendegraft asked for a grievance and was immediately placed him in segregation—then of course the jury could conclude that Pendegraft's request is what motivated the adverse action. "The closer two events are, the more likely that the first caused the second." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). In this instance, the adverse action came "so close on the heels" of Pendegraft's protected act that "an inference of causation is sensible." *Id.* (holding that a worker who handed

his supervisor a note that complained of workplace discrimination and was immediately fired had established an inference of causation by way of suspicious timing).

As for the second element, Thole argues there is no evidence that his alleged conduct would deter a person from exercising First Amendment activity in the future (Doc. 154, p. 10). Despite the cursory nature of this argument, the Court nevertheless agrees. Pendegraft has not shown that his time in segregation would likely deter a person of ordinary firmness from continuing to engage in protected activity. *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011) (citation omitted).

To begin, while it is unclear exactly how long Pendegraft was in segregation (or "on lock down," as Thole referred to it), it was a week and a half *at the absolute most*. Pendegraft's testimony indicates that while he was in segregation, he was in a cell "straight across the hall" from the other cell he had been in (Doc. 203-1. p. 167). Aside from that, Pendegraft said nothing about his time in segregation (*see* Doc. 203-1). For example, Pendegraft did not say if he was given a ticket, if he lost any good time credit, or if his security status was changed as a result of his placement in segregation. He doesn't say if he was completely isolated from others, and if so, for how many hours a day. He doesn't say if his privileges were restricted or whether he was allowed to go to the commissary or to recreation time, to make or receive phone calls, or to have visitors. He doesn't say where he ate his meals or whether he was allowed to shower, to attend religious services, to obtain materials from the law library, or to access his personal property.

In short, there is simply not enough evidence for a reasonable jury to find that the

duration or conditions of the time Pendegraft spent in segregation would likely deter a person of ordinary firmness from engaging in protected activity. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving party." (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986))); *Szymanski v. Rite-Way Lawn Maint. Co.*, 231 F.3d 360, 364 (7th Cir. 2000) ("[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion.") *But see Montanez v. Butler*, No. 14-CV-754-MJR-SCW, 2017 WL 1425943, at *2, 5, 6 (S.D. Ill. Apr. 21, 2017) (plaintiff survived summary judgment on retaliation claim where evidence showed he was given a false disciplinary ticket that was eventually expunged but only after he endured five months in segregation, five months of commissary restriction, and three months of yard restriction); *Wilson v. Rensing*, No. 3:15-CV-1249-NJR-DGW, 2018 WL 784053, at *3 (S.D. Ill. Feb. 8, 2018) (jury could find plaintiff suffered a substantial deprivation because evidence showed he spent one month in segregation followed by one month on increased security status with restricted privileges); *Cullum v. Godinez*, No. 314CV00012-SMY-PMF, 2016 WL 304865, at *1 (S.D. Ill. Jan. 25, 2016) (jury could find plaintiff suffered deprivation likely to deter future protected activity where evidence showed plaintiff spent 30 days in a segregation unit, lost gym and yard privileges for 30 days, lost access to commissary privileges for 30 days, had his security level demoted, and lost some personal items); *Jackson v. Thurmer*, 748 F. Supp. 2d 990, 1003 (W.D. Wis.

2010) (plaintiff survived summary judgment on retaliation claim where evidence showed he spent 45 days in disciplinary segregation, lost his prison job, and was then recommended for "maximum custody" and transferred to a different prison).

Because there is insufficient evidence for Pendegraft to establish all elements of his *prima facie* case, Thole is entitled to summary judgment on Pendegraft's claim of retaliation.

<h2 style="text-align:center">CONCLUSION</h2>

For the reasons set forth above, the Motion for Summary Judgment filed by Defendants Brandi Beasley and Francis Kayira (Doc. 141) is **DENIED in part and MOOTED in part**. It is denied as to Dr. Kayira and mooted as to Brandi Beasley. The Motion for Summary Judgment filed by Defendant Alberto Butalid (Doc. 148) is **GRANTED**. Dr. Butalid is **DISMISSED with prejudice**, and judgment will be entered in his favor at the close of the case. The Motion for Summary Judgment filed by Defendants Mike Arnold, Luke Brandmeyer, Mark Etter, Jacey Faulkner, Michelle Nordike, and Kyle Thole (Doc. 154) is **DENIED in part, GRANTED in part, and MOOTED in part**. It is mooted as to Defendants Arnold, Etter, Faulkner, and Nordike. It is denied as to Defendant Brandmeyer on Count 1, and granted as to Defendant Thole on Count 1 and Count 2. Defendant Thole is **DISMISSED with prejudice**, and judgment will be entered in his favor at the close of the case.

Accordingly, this case shall proceed to trial on the following claim:

**COUNT 1:** Brandmeyer and Dr. Kayira were deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment.

Pendegraft's amended motion to appoint expert witnesses (Doc. 192) will be addressed by separate order.

IT IS SO ORDERED.

DATED:   March 30, 2018

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**